AGR HALIFAX FUND, INC., AG Super Fund International, Partners, L.P., Ambro International, S.A., Gam Arbitrage Investments, Inc., Leonardo, L.P., Ramius Fund, Ltd., and Raphael., L.P., Plaintiffs,

v.

Peter J. FISCINA, Myron M. Blumenthal, Vincent DeVita, Jr., and Certified Diabetic Services, Inc., a Delaware corporation, Defendants.

Civil Action No. 17226.

Court of Chancery of Delaware,
New Castle County.

Submitted: July 26, 1999.
Decided: Aug. 3, 1999.
As Revised: Aug. 10, 1999.

Andre G. Bouchard and Joel Friedlander, of Bouchard, Margules, Friedlander & Maloneyhuss, Wilmington, for Plaintiffs.

Gregory V. Varallo and Kelly A. Herring, of Richards, Layton & Finger, Wilmington, for Defendants.

## OPINION

JACOBS, Vice Chancellor.

Pending is a motion for summary judgment in this action brought under 8 *Del. C.* § 225 to determine the lawful directors of defendant Certified Diabetic Services, Inc. ("CDS"), a Delaware corporation. The petitioners, who claim to be holders of record of a majority of CDS common stock, contend that on June 14, 1999 they executed and delivered written consents that had operated to (a) remove the individual director respondents—Peter J. Fiscina ("Fiscina"), Myron M. Blumenthal ("Blumenthal"), and Vincent DeVita, Jr. ("DeVita")—from the CDS Board of Directors (collectively, the "Fiscina Board"); (b) amend CDS's By–Laws to reduce the size of the CDS Board to two members; and (c) replace the Fiscina Board with Jeffrey C. Smith and Matthew B. Lieberman (collectively, the "Smith Board"). The petitioners claim that the Smith Board is the lawful board of directors of CDS.

The respondents dispute that, and claim that the petitioners' actions taken by written consent were invalid, for two reasons. First, the respondents contend that on May 24, 1999—three weeks before—the CDS charter was amended to prohibit shareholders from acting by written consent (the "May 24 Charter Amendment"). Second, respondents argue that in any event the petitioners were not valid common stockholders of record, and therefore not entitled to vote, on June 14, 1999, because they had not properly converted their CDS preferred shares into CDS voting common shares by that date.

This is the Opinion of the Court on the merits of this § 225 action. For the reasons next discussed, I conclude that the Smith Board is the lawful Board of Directors of CDS and that therefore the petitioners' motion for summary judgment must be granted.

## I. BACKGROUND

The facts, as narrated below, are undisputed.

## A. The Parties

CDS, a Delaware corporation with its principal place of business in Naples, Florida, markets and sells by mail order throughout the United States, products and services for retail customers suffering from diabetes. CDS began operations in November 1995, and its common stock began trading on the NASDAQ Over-the-Counter Electronic Bulletin Board in March 1997. In fiscal year 1998, CDS reported a loss of approximately $1.2 million on total revenues of approximately $8.2 million.

The individual respondents, Messrs. Fiscina, Blumenthal, and DeVita all claim to be CDS's lawful Board of Directors since their self-appointment by written consent on May 24, 1999.

The petitioners are entities that purport to be holders of record of 12,130,525 shares of CDS common stock, representing approximately 52% of CDS's 22,975,525 outstanding common shares on June 14, 1999.[1]

## B. Three Consents and a Charter Amendment

A principal issue in this case is whether the Charter amendment is valid. That issue turns upon the legal effect of three sets of written consents, the first two of which were executed by the respondents, as CDS shareholders, on May 19 and 20, 1999. The first set of consents purported (i) to reduce the number of directors on the CDS Board to three, and (ii) to elect Messrs. Fiscina, Blumenthal, and DeVita as the CDS Board of Directors (the "Shareholder Board Consents"). The second set of consents purported to authorize an amendment to the CDS charter that would eliminate the CDS shareholders' ability to act by written consent (the "Shareholder Charter Consents"). Each stockholder that executed a Shareholder Board Consent and a Shareholder Charter Consent delivered both on the same date—either May 19th or May 20th—to Mr. Herbert Rosedale, the directors' counsel.

The third set of consents was executed on May 20, 1999 by the members of the Fiscina Board, purporting to act on behalf of CDS. These consents proposed a CDS charter amendment that would eliminate the shareholders' then-existing right to act by written consent in lieu of a meeting, and recommended that the CDS shareholders approve it (the "Board Charter Consents"). It is undisputed that at the time the alleged Fiscina Board signed and executed the Board Charter Consents, Messrs. Fiscina, Blumenthal, and DeVita had *not* yet been elected as the members of CDS's Board.[2] That event did not occur until May 24, 1999, when Mr. Rosedale delivered all three sets of consents to the Company.

Thereafter, on that same date, May 24, 1999, Fiscina caused to be filed with the Delaware Secretary of State a Certificate of Amendment (the "Charter Amendment") that purported to amend CDS's charter to provide that any action required or permitted to be taken by a vote of stockholders may only be taken at "an actual meeting of the stockholders in accordance with the General Corporation Law of the State of Delaware."

---

1. The petitioners (and their holdings) are as follows: AGR Halifax Fund Ltd. (5,062,155 shares); AG Super Fund International Partners, L.P. (401,243 shares); Amro International, S.A. (2,022,430 shares); GAM Arbitrage Investments, Inc. (401,243 shares); Leonardo, L.P. (3,035,671 shares); and Ramius Fund, Ltd. (806,540 shares); Raphael, L.P. (401,243 shares).

2. Mr. Rosedale, the respondents' counsel at the time, conceded this point in his affidavit. *See e.g.,* Rosedale Aff. ¶ 17 ("[I]t is correct that the Director's Consent declaring advisable the Certificate Amendment was signed *prior to* the time of delivery of the First Consents appointing my clients as directors of the Company." (emphasis added)). At that time, the members of the CDS Board were Messrs. Fiscina, Albert R. Ayala, Frederick J. Roberts, Ronald L. Rucker, and Gerald A. Olson.

## C. The Conversion of the Series A Preferred Shares

At the time the above described three sets of consents were executed and delivered, all of the petitioners were Series A Preferred shareholders. Concerned that the Fiscina Board had taken control of the Board to obstruct an ongoing investigation (by the predecessor Board) of Mr. Fiscina's management, the petitioners concluded that the Fiscina Board should be removed from office. To accomplish that, the petitioners converted their preferred shares into common shares that have the right to vote. They did so on June 14, 1999 at approximately 9:00 a.m., by transmitting Conversion Notices to CDS by facsimile. Those Conversion Notices stated the petitioners' intention to immediately convert 2,993 of their Series A Preferred shares into 12,130,525 shares of CDS common stock having the right to vote. As earlier noted, those 12,130,525 shares, once issued, would represent approximately 52% of CDS's outstanding common stock.

Later that same day (June 14, 1999) the petitioners executed and delivered to the Company written consents executed by the petitioners as holders of approximately 52% of CDS's outstanding common shares. Those consents operated to (a) remove Fiscina, Blumenthal, and DeVita as CDS directors, (b) reduce the size of the CDS board to two members, and (c) elect Smith and Lieberman as CDS's directors.

Shortly thereafter, the petitioners delivered their original Series A Preferred Stock certificates to CDS. Five of the petitioners delivered the original certificates by overnight mail on June 14, 1999, and one petitioner delivered the original certificates on June 16, 1999. The remaining petitioner was unable to deliver the original certificates to CDS until July 16, 1999.[3]

## D. This § 225 Action

Finally, on that same day, June 14, 1999, the petitioners also commenced this action under 8 *Del. C.* § 225 for a determination by this Court that Messrs. Smith and Lieberman were the lawful directors of CDS. Thereafter, the petitioners moved for summary judgment.[4] That motion was heard on July 27, 1999, and this is the Court's decision on that motion.

## II. THE CONTENTIONS

The contentions are straightforward. The petitioners claim that the Smith Board is the lawful CDS Board because (i) the respondents' May 24 Charter Amendment purporting to eliminate the CDS common shareholders' right to act by written consent was invalid *ab initio*, (ii) the petitioners had converted their Series A Preferred shares into common shares on June 14, 1999, and on that same day, lawfully elected the Smith Board by written consent.

The respondents disagree. They claim that the Fiscina Board is the lawful CDS Board because (i) the petitioners' June 14, 1999 written consents were invalid, having been proscribed categorically by the May 24 Charter Amendment, and (ii) in any event, the petitioners never validly converted their Preferred shares to CDS common shares, and were therefore not record holders of stock entitled to vote for the Smith Board on June 14, 1999.

These colliding positions generate two key issues that must be decided. The first (as earlier noted) is whether the May 24

---

3. The delay was caused, in part, because Mr. Thomas Badian, on behalf of petitioner Amro International, S.A., had to retrieve the originally executed Conversion Notice from Switzerland *via* the mails. Badian Aff. at 5. Thereafter, upon receiving the respondents' reply brief and realizing that the original Conversion Notice and certificates had not yet been delivered to CDS, Mr. Badian promptly delivered those documents to CDS.

4. The petitioners had also moved on June 14 for a temporary restraining order. That motion became moot on June 18, 1999, when the parties entered into a *status quo* order confirming that the Fiscina Board would continue to serve in that capacity until the Court ruled on the summary judgment motion.

Charter Amendment eliminating the CDS shareholders' right to act by written consent is valid. If it is not, then the second issue becomes whether the petitioners properly converted their Series A Shares to CDS common shares on June 14, 1999, in order to become entitled to vote by written consent to replace the Fiscina Board with the Smith Board.

## III. ANALYSIS

Summary judgment will be granted where the Court determines that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[5] In making those determinations, the Court must view any disputed evidence in the light most favorable to the nonmoving party and must accept all undisputed factual assertions made by either party as true.[6] Summary judgment will be denied only if "there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or inferences to be drawn therefrom."[7]

Because the parties agree that no material facts are in dispute, the issues presented may be decided as a matter of law. The Court now turns to those issues.

### A. The Validity of the May 24 Charter Amendment

The petitioners claim that the May 24 Charter Amendment is void because it was adopted in violation of 8 *Del. C.* § 242(b), the statutory provision that governs amendments to corporate charters. That statute pertinently provides that:

> (b) Every amendment authorized by subsection (a) of this section shall be made and effected in the following manner:

> (1) If the corporation has capital stock, its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a special meeting of the stockholders entitled to vote in respect thereof for the consideration of such amendment or directing that the amendment proposed be considered at the next annual meeting of the stockholders.

▇▇▇ Thus, § 242(b) prescribes a two-step process that must be followed in precise sequence to amend a Delaware corporation's charter.[8] The first requires the board of directors to adopt a resolution proposing the amendment, declaring its advisability, and calling for a shareholder vote at a special or annual shareholder meeting.[9] The second step requires that the proposed amendment be considered and voted upon at a special meeting (or at the next annual meeting) of stockholders.[10] Both steps must occur in that sequence, and under no circumstances may the

---

5. Ch. Ct. R. 56(c); *Mentor Graphics Corporation v. Quickturn Design Systems, Inc.,* Del Ch., C.A. No. 16584, mem. op. at 7, Jacobs, V.C., 1998 WL 731660 (Oct. 9, 1998); *see also Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990); *Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114, 1115 (1979).

6. *Mentor Graphics, supra* note 4, at 7 (citing *Brown,* 403 A.2d at 1115).

7. *Seagraves v. Urstadt Property Co., Inc.,* Del. Ch., C.A. No. 10307, mem. op. at 7, Jacobs, V.C., 1996 WL 159626 (April 1, 1996) (citations omitted).

8. *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1381 (1996) ("[I]t is significant that *two discrete steps* must occur, *in precise sequence,* to

amend the certificate of incorporation under 8 *Del. C.* § 242 ..." (emphasis added)); *Klang v. Smith's Food & Drug Centers, Inc.,* Del. Ch., C.A. No. 15012, mem. op. at 40, Chandler, V.C., 1997 WL 257463 (May 13, 1997); *see also Newman v. Warren,* Del. Ch., 684 A.2d 1239, 1245 n. 2 (1996); *see also* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporation and Business Organizations* § 8.10, at 8–13 (3d ed. 1999 Supp.).

9. *Williams,* 671 A.2d at 1381; *Klang, supra* note 7, at 40.

10. *Id.*

stockholders act before the mandated board action proposing and recommending the amendment.[11] The larger question implicated here is how that statutory mandate is to be carried out where the board of directors and the stockholders act by written consent rather than at a meeting.

The petitioners argue that the respondents failed to comply with either of these two legally required steps. They claim that the first step was not validly carried out because Fiscina, Blumenthal, and DeVita did not constitute CDS's Board at the time they executed the Board Charter Consents proposing and recommending the proposed charter amendment. It is undisputed that Fiscina, Blumenthal, and DeVita prepared the Board Charter Consents on May 20, 1999, and that they did not legally constitute the CDS Board until May 24, 1999—the date that the Shareholder Board Consents naming them as directors were delivered to the corporation.[12] The petitioners argue that because Fiscina, Blumenthal, and DeVita were not CDS Board members at the time they adopted the Board Charter Consent, the May 24 Charter Amendment was invalid because it was never the subject of a resolution adopted by the lawful CDS Board.

The petitioners also contend that the second requirement of § 242(b)—a subsequent shareholder vote on the board resolution—was also not fulfilled because the respondents, as CDS stockholders, executed the May 24 Charter Consents on May 19 and 20—*five and four days*, respectively, *before* May 24, 1999—the earliest date the Fiscina Board could have taken office.

The respondents, insist that the Fiscina Board did comply with § 242(b)'s two requirements. Their argument runs as follows: § 242(b) must be read together and harmonized with 8 *Del. C.* § 228(c) and § 141(f). Section 141(f) permits a board to act by unanimous written consent without having to hold a meeting.[13] Section § 228(c) provides that written consents signed by the holders of a sufficient number of shares to take action, will become effective upon their delivery to the corporation.[14] When those statutory provisions are read together, respondents urge, the conclusion is inescapable that the Fiscina Board's consent actions adopting the May 24 Charter Amendment were lawful, because the respondents purposefully timed the *delivery* of those three consents to render them fully effective and in compliance with § 242(b). To say it differently, respondents argue that the two steps mandated by § 242(b)—a board resolution proposing the charter amendment followed by shareholder action approving the proposal—were satisfied by virtue of § 228(c), because the written consents evidencing those actions, even though prepared days earlier, were delivered to the corporation in the precise sequence mandated by § 242(b).

---

11. *See Williams,* 671 A.2d at 1381.

12. 8 *Del. C.* § 228(c) (signed, written consents effective upon delivery to the corporation).

13. Section 141(f) pertinently provides that "any action required or permitted to be taken at any meeting of the board of directors ... may be taken without a meeting if all members of the board ..., consent thereto in writing."

14. Specifically, § 228(c) pertinently states:
    "[N]o written consent shall be effective to take the corporate action referred to therein unless, within sixty days of the earliest dated consent delivered in the manner required by this section to the corporation, written consents signed by a sufficient number of holders ... to take action are delivered to the corporation...."
    *See also Allen v. Prime Computer, Inc.,* Del. Supr., 540 A.2d 417, 420 (1988) ("[A]ny corporate action taken under § 228 is effective only upon the delivery of the proper number of valid and unrevoked consents to the corporation."); 1 R. Franklin Balotti & Jesse Finkelstein, *Delaware Law of Corporations & Business Organizations* § 7.29 (3d ed. and 1999 Supp.) (commenting on 8 *Del. C.* § 228, and stating that "[t]he action [taken by written consent] is effective when a legally sufficient consent (or consents) is delivered to the corporation ...").

Specifically, the respondents point out that the three consents were delivered to the company on May 24, 1999 in the following order: (i) the Shareholder Board Consents electing the Fiscina Board as CDS's new Board; followed by (ii) the Board Charter Consents, wherein the Fiscina Board adopted a resolution proposing and recommending the May 24 Charter Amendment; and (iii) finally, the Shareholder Charter Consents, constituting the shareholders' approval of the May 24 Charter Amendment. Thus, respondents claim, the sequence of the delivery of the three consents operated to validate the Shareholders Charter Consents, because that action became effective only *after* the Board Charter Consents proposing the May 24 Charter Amendment had become effective, and that latter consent action became effective only *after* the Shareholder Board Consents electing the respondents as the CDS Board had been delivered to the Company.

■ The broader problem posed here is how the sequence of director and stockholder actions mandated by § 242(b) is properly carried out where the board of directors and the shareholders act by written consent rather than at a meeting. The respondents argue that the § 242(b) mandate is satisfied as long as the consents are delivered to the corporation in the proper sequence, no matter when they may have been executed.[15] The petitioners assiduously disagree, at least where—as here—the consents are executed at a time when the persons purporting to take action binding the corporation are not its duly elected directors. In these circumstances, petitioners argue, the "action" by consent is no "action" at all, at least in any cognizable legal sense. Rather, it is a nullity and does not become any less so because its written expression (the consent) is delivered to the corporation at some later date.

I conclude, for the following reasons, that the petitioners' argument is correct.

The respondents ask the Court to construe § 228(c) as modifying § 242(b), with the result that persons who execute a written consent proposing a charter amendment need not be directors of the corporation at that time, so long as their written consent is *delivered* to the corporation before the document that evidences the shareholders' consent to the charter amendment. The difficulty is that no language in § 228(c) supports that position. Nor have respondents cited any legislative history or case law that compels that result. Indeed, that result would do violence to 8 *Del. C.* § 141(a), which contemplates that only the *de jure* directors of a corporation are empowered to act on its behalf.[16] Nothing in § 228(c) suggests a legislative intent to depart from that principle, nor would it be salutary or sensible to so interpret § 242(b) where action is taken by written consent rather than at a meeting.

Although the analogy may be imperfect, the respondents' position is akin to arguing that three persons who are seeking election as directors—but who have not yet been elected—hold a meeting. Purporting to act as the board, those persons adopt a resolution proposing an amendment to the corporation's charter and providing that the resolutions will become effective if and when those three persons are elected as directors. Surely no one would seriously contend that that resolution—a nullity from the outset—would suddenly become legally valid and effective if (and when) its adopters are elected as directors one week later. Why, then, should the result be any different where those same persons act by a written consent that contemplates that their acts will become effective if and when the consent is delivered to the corporation? In either case, persons who are not directors are attempting to make decisions

---

**15.** Subject, of course, to the statutory requirement that the consents be delivered to the corporation within 60 days of their execution. 8 *Del. C.* § 228(c).

**16.** 8 *Del. C.* § 141(a). The corporation's duly appointed officers would also, of course, be authorized to act on the corporation's behalf on matters within the scope of their duties.

*for the corporation* at a time that they have neither the statutory power under § 141(a) to do so, nor the weight of fiduciary responsibility which accompanies that power.

■ It is the petitioners' interpretation and harmonization of 8 *Del. C.* §§ 141(f) and 242(b) that is most faithful to the principle underlying § 141(a), namely, that the board of directors alone is empowered to act on behalf of the corporation, including taking action to initiate an amendment to the corporation's charter.[17] Because § 242(b), properly understood, mandates that the board of directors is the body empowered to adopt a resolution to amend the charter and to submit that resolution for a shareholder vote, it follows that in this case only the lawful *de jure* board of directors of CDS would have been empowered to take such action, either at a meeting or by unanimous written consent. It is undisputed that Fiscina, Blumenthal, and DeVita did *not* constitute the lawful CDS Board on May 20, 1999, the date they purported to adopt by unanimous written consent the May 24 Charter Amendment. On that date, the *de jure* board consisted of Messrs. Fiscina, Albert R. Ayala, Frederick J. Roberts, Ronald L. Rucker, and Gerald L. Olson. The earliest date that the Fiscina Board could have become the lawful CDS Board was May 24, 1999. For those reasons, the May 24 Charter Amendment was invalid from its inception.

The respondents proclaim that that result will "wreak havoc" upon the ability of directors to use the written consent mechanism, but that contention totally lacks force where (as here) the persons acting by written consent were not the board of directors at the time they purported to act. Any other conclusion would require this Court to validate as binding upon a corporation actions taken by persons who were not its directors. No statutory provision or case law compels this Court to interpret § 242(b) and § 228(c) in that way.

**B. The Conversion Date**

Because the Purported Charter Amendment was invalid, and the CDS shareholders had the power to act by written consent on June 14, 1999, the Court must now confront the second issue: whether the petitioners had sufficient common shares to act (by written consent) to remove the Fiscina Board and replace them with the Smith Board on June 14. The answer to that question depends on what precisely was the Conversion Date on which the petitioners' Preferred stock was converted to CDS common stock. That is the issue, because Section 2(f)(iv) of the Certificate of Designations requires that the holders of Series A Preferred shares upon conversion "shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the Conversion Date." Because the petitioners actions by written consent occurred on June 14, 1999, those acts were valid only if the Conversion Date was also June 14, 1999. If the Conversion Date occurred thereafter, then those consent actions would necessarily be invalid, as the petitioners would not have owned any common stock (and therefore would have had no right to vote) on June 14, 1999.

To determine the Conversion Date, the Court must look to Section 2(f)(1) of the Certificate of Designation, which pertinently states:

*Holder's Delivery Requirements.* To convert Preferred Shares into full shares of Common Stock on any date (the "Conversion Date"), the holder thereof shall (A) transmit by facsimile (or otherwise deliver), for receipt on or prior to 11:59 p.m., Central Time on such date, a fully executed Conversion Notice to the Company or its designated transfer agent (the "Transfer Agent"),

---

**17.** Cf. *Quicktum Design Systems, Inc. v. Mentor Graphics Corporation,* Del.Supr., 721 A.2d 1281 (1998).

and (B) surrender to a common carrier for delivery to the Company or the Transfer Agent as soon as practicable following such date, the original certificates representing the Preferred Shares being converted (or an indemnification undertaking with respect to such shares in the case of their loss, theft or destruction) (the "Preferred Stock Certificates") and the originally executed Conversion Notice.[18]

This provision requires a Series A Preferred shareholder to complete two steps to validly convert the holder's Series A shares to CDS common stock. First, the Series A Preferred shareholder must transmit by facsimile or otherwise deliver a fully executed Conversion Notice to CDS or its transfer agent. Second, the shareholder must then surrender to a common carrier for delivery to CDS, the original Preferred stock certificates *as soon as practicable* following the transmittal date.

■ The respondents contend that the second step was not carried out here. The petitioners contend that it was. For the following reasons I conclude that the petitioners are correct.

It is undisputed that on June 14, 1999, at approximately 9:00 a.m., the petitioners transmitted Conversion Notices to CDS, stating their intention of immediately converting 2,993 Series A Preferred Shares to 12,130,525 shares of CDS common stock. It is also undisputed that shortly thereafter all petitioners surrendered their original Series A Preferred Stock Certificates to the company.

■ The petitioners contend that under the Certificate of Designation only the first step need be satisfied to establish the Conversion date. That is, petitioners contend that the date on which they transmitted the Conversion Notices to the company by facsimile—June 14, 1999—should be considered unconditionally as the Conversion Date, and that the second step should be regarded as merely a "housekeeping" provision of no substantive legal significance. The respondents disagree. They argue that both steps prescribed by the Certificate of Designations are legally significant, and that both must be carried out validly to establish the Conversion Date.

I agree that both steps are substantively mandated by the Certificate of Designations, and must be accomplished in order validly to establish the Conversion Date. There is, in my view, no other plausible reading of the Certificate of Designations. The clauses prescribing each step are related to each other by the conjunction "and." Moreover, the language of the Certificate plainly says that both steps must be completed to set the Conversion Date. That does *not* mean, however, that the Conversion Date is the date that the original Certificates are ultimately submitted to or received by the corporation. Rather, I construe the relevant language of the Certificate of Designations to mean that (i) upon submitting a Conversion Notice to the company, the Series A Preferred shareholder thereby establishes the Conversion Date and becomes entitled to convert his shares on that date, but (ii) that right is defeasible (*i.e.*, the conversion becomes voidable) if the Series A Preferred shareholder fails thereafter to submit the original Certificates to the corporation "as soon as practicable." In other words, so long as the Series A Preferred shareholder submits a Conversion Notice to the Company, and as soon as practicable thereafter submits to the Company its original Series A certificates, the Conversion Date is the date the Conversion Notice was transmitted.

Here, there is no evidence that the petitioners failed to submit their original certificates "as soon as practicable." Six of the seven petitioners submitted them to CDS within two days of their Conversion Notices. Although the seventh petitioner, Amro International, S.A. ("Amro"), submitted its original certificates one month

18. Certificate of Designations, 2(f)(i).

after it delivered its Conversion Notice, the record shows that the delay occurred because (i) the original Conversion Notice that was to be delivered to CDS along with the original certificates was located in Switzerland and had to be retrieved by the mails; and (ii) Amro's agent mistakenly believed that the original Conversion Notice and certificates had been forwarded to CDS when, in fact, they had not. Upon receiving the respondents' reply brief, Amro's agent learned of the error, and promptly corrected it by delivering the original Conversion Notice and certificates to CDS. The respondents have furnished no credible evidence that Amro did not submit its original certificate "as soon as practicable."

## IV. CONCLUSION

For the reasons set forth above, I conclude that the Smith Board constitutes the lawful CDS Board. The petitioners shall submit an appropriate implementing order on notice to the respondents.