ALPINE INVESTMENT PARTNERS,
et al., Plaintiffs,

v.

LJM2 CAPITAL MANAGEMENT,
L.P., Defendant,

v.

LJM2 Co–Investment, L.P. and
Partnership Services, LLC.,
Nominal Defendants.

C.A.No. 19339–NC.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 8, 2002.

Decided: March 14, 2002.
Revised March 28, 2002.

Michael P. Goldman, Peter J. Walsh, Jr., Richard L. Renck, Potter Anderson & Corroon, LLP, Wilmington, Delaware, Joseph M. McLaughlin, Michelle B. Cherende, Simpson Thacher & Bartlett, New York City, for plaintiffs.

Craig B. Smith, David A. Jenkins, Smith, Katzenstein & Furlow, LLP, Wilmington, Delaware, for defendants.

Henry E. Gallagher, Jr., Arthur G. Connolly, III, Connolly Bove Lodge & Hutz, LLP, Wilmington, Delaware, Jeffrey Q. Smith, Susan F. DiCicco, King & Spalding, New York City, for nominal defendants.

## OPINION

JACOBS, Vice Chancellor.

In this action, brought under 6 *Del.C.* §§ 17–110 and 17–111, the plaintiffs, who are limited partners of LJM2 Co–Investment, L.P., a Delaware limited partnership ("LJM2" or "the Partnership"), seek a determination that they properly removed the defendant LJM2 Capital Management, L.P. ("Capital Management") as the General Partner, and installed Partnership Services, LLC ("Partnership Services") as the new General Partner.[1] Under the LJM2 Partnership Agreement, at least 66 2/3% in interest of the limited partners can remove the General Partner, by vote or written consent, "for any reason or no reason." It is undisputed that written consents constituting the vote required to remove Capital Management were obtained, and that all other requirements for removal imposed by the Partnership Agreement were satisfied.

Only one issue is presented: were the limited partners legally required to deliver their written consents to the General Partner for the removal vote to become effective, even though delivery is not required by the partnership statute or the Partnership Agreement? If delivery was required, then in these circumstances Capital Management was not validly removed as the General Partner. If, on the other hand, delivery was not a requirement, then Capital Management was validly removed.[2]

This is the Opinion of the Court deciding the merits of that issue. For the reasons set forth below, the Court determines that delivery of the written consents was not required to remove the General Partner, that Capital Management was validly removed as LJM2's General Partner, and that Partnership Services is now the *de jure* General Partner of the Partnership. Accordingly, judgment will be granted in the plaintiffs' favor on their claim and against the defendant on its counterclaims.

## I. THE PERTINENT FACTS AND THE CONTENTIONS

### A. The Parties And The Events That Led To This Lawsuit

The plaintiffs are certain limited partners of LJM2, a Delaware limited partner-

---

**1.** In its First and Second Counterclaims, Capital Management seeks a declaration that it continues as LJM2's *de jure* General Partner, because at the time the written consents upon which the plaintiffs rely were submitted, most of the limited partners, including the plaintiffs, had become "defaulting partners" that lacked the power to vote. As a consequence, Capital Management claims, those written consents were legally ineffective. Capital Management has asserted two other counterclaims that are unrelated to that claim and issue. By agreement of the parties, the only claims to be resolved at this stage are those raised in the Complaint and in Capital Management's First and Second Counterclaims. Accordingly, Capital Management's Third and Fourth Counterclaims will not be addressed at this time.

**2.** The parties have agreed to present this matter for resolution on a paper record, including affidavits, discovery responses and a stipulation of facts.

ship that, through its General Partner, was affiliated with Enron Corporation ("Enron"). LJM2's limited partners include several large financial institutions and investment funds.[3]

Until the events at issue in this lawsuit, LJM2's General Partner was Capital Management. On July 25, 2001, Andrew Fastow, who at that time was Enron's Chief Financial Officer and a principal of Capital Management, transferred his interest in Capital Management to Michael Kopper ("Kopper"), who at that time was a senior employee and a Managing Director of Enron. As a result of that transfer, Kopper now owns and controls Capital Management.

The critical event that prompted this lawsuit was the removal, by the limited partners, of Capital Management as the General Partner of LJM2, and the installation of Partnership Services as LJM2's new General Partner. Partnership Services is an affiliate of Jay Alix and Associates, a firm that specializes in "turnaround" situations. What precipitated the limited partners' action was the highly publicized financial collapse of Enron, which filed Federal bankruptcy proceedings in December 2001. Enron's financial demise led to a host of lawsuits and governmental investigations. Messrs. Fastow and Kopper are named in many of the lawsuits that arose out of transactions between and among Enron, LJM2 and various third parties. Those two gentlemen and others are also the subject of ongoing governmental investigations being con-

ducted by the United States Securities and Exchange Commission and by certain Congressional committees. After recently being subpoenaed to appear before a Congressional committee investigating Enron's downfall, Mr. Fastow invoked the Fifth Amendment and refused to testify.

## A. Facts That Are Critical To The Issues Presented

To understand the nature and significance of the legal issue presented, it becomes necessary first to discuss (1) the provisions of the LJM2 Partnership Agreement that govern the removal of the General Partner,[4] and (2) the actions taken by the limited partners under those provisions to effect the removal of Capital Management, and the substitution of Partnership Services, as the General Partner of LJM2.

The primary provisions that govern the removal of the General Partner are Sections 6.2(b) and 6.2(c) of the Partnership Agreement. Section 6.2(b) states in pertinent part:

> Subject to Section 6.2(c), the Limited Partners may, for any reason or no reason, remove the General Partner and appoint a new general partner to manage the Partnership in accordance with this Section 6.2, upon (i) the recommendation of at least a majority of the members of the Advisory Committee to remove the General Partner, and (ii) a determination by at least 66 2/3% in Interest of the Limited Partners, acting

---

**3.** The limited partners include institutions such as Acquisition Fund Four, L.P., AIG Private Equity Portfolio, L.P., Dresdner Kleinwort Capital I., L.P., Fort Washington Private Equity Investors, II, L.P., J.P. Morgan Partnership Investment Corporation and Sixty Wall Street Fund, L.P. The parties have stipulated that as of January 3, 2002, there were 52 limited partners of the Partnership, whose

total capital commitment equaled $387,145,000.

**4.** The Partnership Agreement in effect at the time of the relevant events was the Third Amended and Restated Partnership Agreement entered as of April 5, 2000, as amended on June 30, 2000 and March 12, 2001 (the "Partnership Agreement").

by written consent or vote, to remove the General Partner....

Section 6.2(c) provides that no removal of the General Partner shall be final and effective until:

a new general partner has been admitted to the Partnership upon such new general partner's execution of a counterpart signature page of this Agreement, and until the General Partner's interest has been converted to a limited partner interest in the Partnership, all in the manner specified in this Section 6.2.

Thus, to remove a General Partner, the Partnership's Advisory Committee must first act to recommend removal, and then two-thirds in Interest of the limited partners must act, by written consent or vote, to remove the General Partner. The removal becomes effective upon the new General Partner executing a counterpart signature page of the Partnership Agreement and upon the (removed) General Partner's interest becoming converted into a limited partner interest in the Partnership. The Partnership Agreement contains no provision that requires that the Advisory Committee recommendation, or the limited partners' written consents, be delivered to the General Partner to effect its removal.

It is undisputed that the aforementioned requirements of Section 6.2 for removing the General Partner were all satisfied. First, between December 31, 2001 and January 3, 2002, seven of the eight members of the Advisory Committee executed written consents recommending the removal of Capital Management as General Partner. Second, as of January 3, 2002, the total Interest in the Partnership of the limited partners was $387,145,000. Thus, the votes or consents of limited partners representing 66 2/3% of that amount, or $258,096,667 in Interest, were needed to remove Capital Management. On January 2 and 3, 2002, 45 of the 52 limited partners, representing $300,140,000—or over 75% in Interest—executed written consents approving (a) the removal of Capital Management as General Partner, and (b) the appointment of Partnership Services as the new General Partner. Lastly, on the morning of January 3, 2002, the President and CEO of Partnership Services executed the counterpart signature page of the Partnership Agreement, which provided for the admission of Partnership Services as the new General Partner and converted Capital Management's interest to a limited partner interest in the Partnership.[5]

Despite the foregoing, Capital Management contends that in these specific circumstances the written consents of the limited partners purporting to remove it as General Partner were legally ineffective. The contentions that Capital Management's advances, and the facts upon which it relies, are next discussed.

---

5. The acts of January 2–3, 2002, removing and replacing the General Partner, were memorialized in an amendment to the Partnership Agreement and in a Restated Certificate of Limited Partnership filed with the Delaware Secretary of State, with an effective time of 12:01 a.m. on January 4, 2002. In this connection, Capital Management argues, in reliance upon *AGR Halifax Fund, Inc. v. Fiscina*, 743 A.2d 1188 (Del.Ch.1999), that Partnership Services may not have been validly appointed as the successor General Partner because it may have signed the undertaking before the requisite written consents were executed and collected. But *Halifax* and the rule for which it stands are inapposite to these facts. In *Halifax*, a charter amendment proposed by a board of directors was held invalid because the directors had amended the charter before they were validly elected, since at that time the board members had not yet delivered their written consents to the corporation as 8 *Del.C.* § 228 required. Here, however, Partnership Services did not take any action before it became the General Partner.

As the Partnership Agreement provides, (and Capital Management points out), not all limited partners may vote on issues such as removal and replacement of the General Partner. "Defaulting Partners," among others, are specifically excluded. Under the Partnership Agreement, a "Defaulting Partner" is any limited partner that fails to make a capital contribution when due.[6] As earlier stated, removal requires the vote of "66 2/3% in Interest of the Limited Partners." For purposes of calculating that percentage, Section 2.1 of the Partnership Agreement excludes the capital commitment of Defaulting Partners, as follows:

> "__% in Interest of the Limited Partners" means, for any specified percentage in interest, those Limited Partners (other than Defaulting Partners, any LJM Related Person, Enron or any of its subsidiaries, and, except as otherwise provided in Section 7.12(b), the Non–Voting Interest of any BHC Partner) whose Commitments collectively represent not less than the specified percentage of the aggregate Commitments of all Limited Partners (other than Defaulting Partners, any LJM Related Person, and, except as otherwise provided in Section 7.12(b), the Non–Voting Interest of any BHC Partner).

In this case, Capital Management contends that all limited partners that executed written consents removing it as the General Partner were Defaulting Partners, and as such were not entitled to vote for removal, at the time the written consents became effective. That contention proceeds from the undisputed fact that on December 7, 2001, Capital Management, in its capacity as the Partnership's General

Partner, made a capital call (in the form of a "Drawdown Notice") to the limited partners. Because the "Drawdown Date" specified in the Drawdown Notice was January 4, 2002, under Section 3.1 of the Partnership Agreement payment of the capital contribution of each limited partner was required to be made by wire transfer by no later than 12:00 noon, New York City time, on January 4, 2002. Any limited partner that failed to wire transfer its capital contribution by that date and time would become a Defaulting Partner.

It is undisputed that all 45 limited partners that voted by written consent to remove Capital Management as General Partner executed their consents by 11:59 p.m. on January 3, 2002. It also is undisputed that sometime before noon on January 4, 2002 those limited partners voted (also by written consent) to install Partnership Services as the new General Partner and to amend the Partnership Agreement to rescind the capital call. Finally, it is undisputed that none of those 45 limited partners paid their portion of the December 7, 2001 capital call when it fell due.

Although the foregoing acts all took place before the bewitching hour of 12:00 noon on January 4, 2002 (at which point the limited partners who had not made their capital payment would otherwise become Defaulting Partners), one act did not—the delivery of the written consents to Capital Management. The delivery did not occur until approximately 7:45 p.m. on January 4, 2002, when attorneys in the New York office of Simpson Thacher & Bartlett, on behalf of certain limited partners, sent copies of the written consents by facsimile transmission to the New York office of Capital Management's counsel,

---

**6.** Section 2.1 of the Partnership Agreement provides that " 'Defaulting Partner' has the meaning set forth in Section 7.9(a)." Section 7.9(a), in turn pertinently provides that "(a) If any Limited Partner fails to make full payment of any portion of its Commitment or any other payment required hereunder when due (a "Defaulting Partner").... "

Dechert Price & Rhoads. It is upon that single fact that Capital Management constructs its position that (i) the written consents did not become legally effective until they were actually delivered, and that (ii) because delivery did not occur until after noon on January 4, 2002, the limited partners who acted to remove Capital Management had already become Defaulting Partners without any power to vote. On this basis, Capital Management concludes, the written consents and its removal were a legal nullity.

## II. ANALYSIS

Capital Management's defense frames the sole issue presented for decision, namely, whether delivery of the written consents to the General Partner were legally required for those consents to become legally effective. Both sides agree that if delivery was not a requirement, then the written consents became effective before noon on January 4th, and the removal of Capital Management (and installation of Partnership Services) as General Partner was legally valid. If delivery was legally required, however, then the removal of Capital Management was legally invalid, because the consents were not delivered until after the voting limited partners had become Defaulting Partners.

Based on the analysis that follows, I conclude that Capital Management was validly removed as the General Partner, and that Partnership Services is the current *de jure* General Partner, of LJM2.

### A. The Validity Of The Written Consents

■ Neither the Partnership Agreement nor the Delaware Revised Uniform Limited Partnership Act ("DRULPA") requires that written consents be delivered to become legally effective. Section 6.02 of the Partnership Agreement, quoted above, contains no such requirement, and Section 17–302(e) of the DRULPA provides:

> Unless otherwise provided in a partnership agreement, on any matter that is to be voted on, consented to or approved by limited partners, the limited partners may take such action without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by the limited partners having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all limited partners entitled to vote thereon were present and voted.[7]

■ The absence of a delivery requirement in DRULPA is particularly noteworthy, because the counterpart provision of the Delaware General Corporation Law ("DGCL") mandates the delivery of written consents. 8 *Del.C.* § 228(a) expressly requires that written consents evincing shareholder action taken without a meeting "shall be *delivered* to the corporation by delivery to its registered office."[8] Except for the requirement that written consents be delivered to the corporation, the provisions of Section 17–302(e) of the DRULPA and of Section 228(a) of the DGCL are parallel in all material respects. It is "a well-established principle of statutory construction that the General Assembly 'is presumed to have inserted every provision into a legislative enactment for some useful purpose and construction, and when different terms are used in various parts of a statute, it is reasonable to assume that a distinction between the terms

---

7. 6 *Del.C.* § 17–302(e).

8. (emphasis added).

was intended.'"[9] In the case of limited partnerships, the intent of the General Assembly was that the requirement of delivery of written consents would be the subject of contract, rather than of legislative mandate. Here, the parties to the LJM2 Partnership Agreement contracted not to require the delivery of written consents for those consents to become effective.

## B. The Invalidity Of Capital Management's Arguments

Despite the absence of any mandate in the statute or the Partnership Agreement, Capital Management insists that this Court must nonetheless rule that the written consents at issue here did not become effective until they were delivered to the General Partner (here, Capital Management). Two reasons are offered as support for that conclusion. The first is that unless a requirement of delivery is implied there can be no way to determine when actions by written consent to remove a General Partner become effective, or whether such actions are successful—a result that would lend itself to such mischief that no such intent can fairly be attributed to the General Assembly. Second, and alternatively, Capital Management argues that, in any event, the Partnership Agreement empowers the General Partner to determine when the consents become effective, and that in this specific case Capital Management determined that the consents would not be effective until they were delivered to the General Partner. Those contentions are next addressed.

### 1. The Argument That The General Partner Established Delivery As A Condition Precedent Under § 6.1

Because Capital Management's second argument is the more easily disposed of, I consider it first. Capital Management claims that Section 6.1(a) of the Partnership Agreement gives the General Partner broad "default" authority to make any determinations that are not expressly provided for in the Partnership Agreement. That category, Capital Management urges, includes a determination that the written consents would become effective only upon their delivery to a specified person. The authority to make a determination of that kind, Capital Management says, is found in the last sentence of Section 6.1(a). The full text of that Section is set forth as follows:

6.1 *Management Authority; Delegation of Authority.*

(a) The management of the Partnership shall be vested exclusively in the General Partner, and the General Partner shall have full control over the business and affairs of the Partnership. The General Partner shall have the power on behalf and in the name of the Partnership to carry out any and all of the objectives and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which the General Partner, in its sole discretion, deems necessary, advisable, convenient or incidental thereto, including the power to acquire and dispose of any Securities (including marketable Securities) and to incur indebtedness. *All determinations not expressly provided for by the terms of this Agreement, shall be determined by the General Partner, whose determination shall, absent manifest error, be final and conclusive as to all the*

---

**9.** *Colonial Ins. Co. of Wisconsin v. Ayers,* 772 A.2d 177, 181 (Del.2001) (quoting *Gen. Motors Corp. v. Burgess,* 545 A.2d 1186, 1191 (Del.1988)).

*Partners.*[10]

Building upon this interpretation of Section 6.1, Capital Management argues that (i) in exercising its authority under Section 6.1(a) it determined that the written consents would become effective only upon delivery, (ii) this determination is final and binding absent a showing of "manifest error," and (iii) no manifest error was shown here.

■ This argument fails on several fronts. First, it is an *ipse dixit* assertion that finds no support in either the text of the Partnership Agreement or in any statutory or case law. Second, the argument construes the last sentence of Section 6.1(a) in a vacuum, divorced from the context in which it appears. Section 6.1, as its title indicates and its text confirms, addresses the *management* authority of the General Partner. It does not address *control* issues that arise outside of the business operational context. Our law distinguishes between "operational" or "enterprise" issues, on the one hand, and "ownership" or "investor rights" issues, on the other.[11] Section 6.1 also reflects that distinction, and its heading and text indicate that that Section is intended to grant

the General Partner "default" decision making power in only the "operational" or "enterprise" sphere. Issues of "control" and related "investor rights" are addressed in Section 6.2, subsection (b) of which addresses and specifies the conditions for removing the General Partner. Delivery of written consents is not one of the conditions that is specified in Section 6.2(b).

Capital Management's contention would require the Court in effect to amend Section 6.2(b), to add as a separate condition for removal "any other requirement determined by the General Partner under Section 6.1." Absent valid grounds for reformation, it is not the role of courts to rewrite the parties' contract.[12] To hold that Section 6.1 grants the General Partner broad authority to prescribe conditions for its own removal that are not expressed in Section 6.2(b), would require this Court to adopt a construction that is unreasonable and contrary to the parties' intent as expressed in the Partnership Agreement.[13]

I conclude, for these reasons, that Capital Management's Section 6.1—based claim of "default" authority to impose a delivery condition for the written consents to become effective, is without merit.

10. Partnership Agreement, § 6.1(a) (emphasis added).

11. *See, e.g., Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1374 (Del.1995) (distinguishing between "operational" issues and "issues affecting stockholder rights"); *Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 147 n. 47 (Del.1997) (distinguishing between "ownership claim" issues and "enterprise" issues).

12. *Cincinnati SMSA Ltd. v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del. 1998).

13. Even if it were supposed that Capital Management had been given the default authority that it claims to have, its exercise of that

authority would be invalid as "manifest error." Absent clear language expressly permitting such action, to allow a conflicted fiduciary such as Capital Management to exercise its power unilaterally, retroactively, and self-interestedly to determine the validity of its own removal (and thereby to maintain itself in control) would constitute an inequitable use of its power. *Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439 (Del.1971). For that reason, Capital Management's determination establishing delivery of the written consents as a condition for its own removal would also constitute "manifest error" within the contemplation of Section 6.1.

## C. The Argument That Delivery Is An Implied Condition For The Consents To Become Effective

■ Capital Management's primary contention is that this Court should determine that the limited partners' written consents did not become effective until they were delivered to the General Partner. Because neither the DRULPA nor the Partnership Agreement makes delivery a condition for the written consents to become effective, Capital Management's position necessarily boils down to a contention that delivery should be a judicially implied contractual requirement of the Partnership Agreement and (by extension) an implied statutory requirement of the DRULPA as well. Unable to cite any case or other authority (except for *Robert's Rules of Order*) to support that position, Capital Management resorts to arguments that are best described as thinly-disguised policy-based appeals to a legislative body, which advocate what Capital Management believes the law should be rather than confront the law as it actually is.[14]

Specifically, Capital Management urges that unless a delivery requirement is implied, the written consent procedure could become unworkable, because under plaintiffs' construction of the statute and the Partnership Agreement, the written consents would not become effective until the moment that consents representing sufficient votes are executed. That moment, Capital Management points out, is unknowable by anyone other than the persons who execute the consents. Thus, the event that triggers legal effectiveness is inherently not objectively verifiable. Such a scheme would often (if not invariably) create a legal contest, and lend itself to mischief, by enabling the back-dating of consents to give the appearance of execution before the contested date. Accordingly, Capital Management concludes, only by adopting a requirement that ties the legal effectiveness of written consents to an objective, uncontestable event—namely, delivery—can these problems be avoided.

This argument fails on both the conceptual and the operational levels. It fails on the conceptual level because it is made in a legal vacuum, divorced from and without any reference to the established legal criteria that govern when a contractual or statutory term may be judicially implied. And, it fails on an operational level because it ignores the reality that, as a practical matter, no action to remove a general partner by written consent can take effect until the general partner is notified of the

---

**14.** Capital Management attempts to analogize this case to a situation arising in the corporate context, where neither the certificate nor the by-laws provides for the establishment of a record date to determine which stockholders are able to vote by written consent. In that circumstance, Capital Management suggests (but does not straight-forwardly argue) a mechanism for setting a record date would be implied. Capital Management then points out that, as with the delivery requirement, neither the Partnership Agreement nor any default provision of the DRULPA requires that a record date be established to determine who is entitled to vote by written consent to remove a General Partner. Yet it cannot be the case (Capital Management says) that there would be no mechanism to determine which limited partners are to vote. Just as a mechanism for setting a record date would be implied in the corporate context, so too (by analogy) would a mechanism to determine when a vote by written consent becomes effective be implied in the partnership context. Apart from being strained, the analogy fails, because in a limited partnership there is no need for a record date-setting mechanism. In this case all 52 limited partners executed a subscription agreement, and the partnership interest that they acquired is not freely transferable without the General Partner's consent. Therefore, unlike a publicly-held corporation whose shares are freely transferable, it can be readily determined from the Partnership's records which limited partners are entitled to vote.

consent action. The fact that such notice must occur as a real world practical matter, is an objective, verifiable event that obviates most, if not all, of the policy concerns raised by Capital Management.

 Given the nature of the substantive principles that govern when a court may—and may not—imply a term into a contract or a statute, Capital Management's avoidance of those principles comes as no great surprise. As a general proposition, for a court to add a limitation that is not found within the express language of the contract is untenable.[15] That is because, "absent grounds for reformation, it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement."[16] And in the narrow context governed by principles of good faith and fair dealing, our Supreme Court has recognized "the occasional necessity of implying such terms in an agreement as to honor the parties' reasonable expectations."[17] Such cases, however, will be "rare and fact-intensive, turning on issues of compelling fairness."[18]

 Even more daunting are the legal obstacles to the judicial implication of a statutory term. As our Supreme Court has stated:

> [W]here a provision is expressly included in one section of a statute but, is omitted from another, it is reasonable to assume that the Legislature was aware of the omission and intended it. The courts may not engraft upon a statute

language which has been clearly excluded therefrom by the Legislature.[19]

That reasoning applies equally to a provision that is expressly included in one statute but is omitted from a separate statute that deals with the identical subject and function. This case involves that paradigm. Here, the General Assembly, when it enacted Section 228 of the DGCL (which governs action by written consent in the corporate context) expressly made delivery a requirement for written consents to become effective, but when it enacted Section 17–302(e) of the DRULPA (which governs action by written consent in the limited partnership context), it omitted that requirement.[20] Because those two provisions deal with the identical subject and function—action by written consent by investors—it would be (in the words of our Supreme Court) "reasonable to assume that the Legislature was aware of the omission and intended it."[21]

 That inference is buttressed when considered in light of the principle of construction that "[a] statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in any other way."[22] Applied to this case, that principle operates as follows: Section 17–302(e) provides that limited partners may act by written consent "if a consent or consents in writing, setting forth the action so taken, shall be *signed* by the limited partners having not less than the minimum number

---

**15.** *Northwestern Nat'l Ins. Co. v. Esmark,* 672 A.2d 41, 44 (Del.1996); *accord Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 745 (Del.1997).

**16.** *Cincinnati SMSA, Ltd.,* 708 A.2d at 992.

**17.** *Id.*

**18.** *Id.*

**19.** *Giuricich v. Emtrol Corp.,* 449 A.2d 232, 238 (Del.1982) (citations omitted).

**20.** 8 *Del.C.* § 228(a); 6 *Del.C.* § 17–302(e).

**21.** *Giuricich,* 449 A.2d at 238.

**22.** *State v. State Employees' Review Board,* 239 Conn. 638, 687 A.2d 134, 143 (1997) (quotations omitted).

of votes ... necessary to ... take such action at a meeting at which all limited partners entitled to vote thereon were present and voted."[23] The provision in Section 17–302(e) that actions by written consent require only that consents representing the requisite number of limited partner votes be "signed," carries with it an implied prohibition against creating any additional requirements, including a requirement that the consents be "delivered."

Capital Management does not even acknowledge, let alone attempt to respond to, these principles or their application to this case. Yet those principles must necessarily serve as the conceptual foundation of any effort to imply a new term into the DRULPA or the Partnership Agreement. On that basis alone, Capital Management's argument collapses.

But, in addition to, and apart from, the absence of a conceptual foundation, Capital Management's position fails at the practical, operational level. Shorn of its embroidery, Capital Management's argument boils down to the proposition that it would be preferable if Section 17–302(e) of the DRULPA, like Section 228 of the DGCL, had been drafted to require delivery of written consents as a condition to their becoming effective. That argument, whatever its substantive merit might be, is appropriately made to the General Assembly, not to this Court.

Moreover, the "parade of horrors" Capital Management attempts to portray is exaggerated, because it overlooks the reality that on a practical, real-world level the signing and collecting of the requisite written consents will not be meaningful until the limited partners give the General Partner notice of the action they have taken. From a purely mechanical standpoint, notice is a necessary component of the act of removal. Capital Management insists that a system in which legal effectiveness depends solely upon collecting the requisite number of signed consents could lend itself to abuse. But any likelihood of abuse is minimized, if not eliminated, if notice of the consent action is given within a reasonable time after the action is taken. Here, the plaintiffs freely concede that under the current statutory scheme, notice of the limited partners' consent action taken would have to be given within a reasonable time.[24] Accordingly, Capital Management's "unworkability" arguments, even if they were cognizable in this Court, are unpersuasive.

**23.** 6 *Del.C.* § 17–302(e) (emphasis added).

**24.** The requirement that notice of the consent action be given within a reasonable time precludes an "abuse" scenario whereby the limited partners act by written consent to remove the General Partner, do not inform the General Partner of their actions, and keep the consents "in their back pocket." The limited partners then allow six months to go by, during which time the General Partner commits the partnership to various contractual arrangements. Only then is the General Partner told that it had been removed six months before. Unlike the delivery requirement that Capital Management advocates, the requirement of reasonable notice is not one that must be created by judicial implication. Rather, the notice requirement already exists, and is externally imposed by recognized doctrines of equity (such as estoppel, laches, and apparent authority) that overlay all contracts. Thus, in the (admittedly far-fetched) hypothetical scenario outlined above, nothing in the statute or the Partnership Agreement expressly requires the limited partners to notify the General Partner of its removal, if the limited partners delay unreasonably in giving such notice. Nonetheless, the limited partners may be estopped or otherwise precluded from challenging contractual commitments made by the General Partner during the time it was unaware that it had been removed. The limited partners may also be faced with the argument that they are estopped from relying upon their written consents.

### III. CONCLUSION

For the above reasons, judgment will be entered in favor of the plaintiffs, and against the defendant, on the plaintiffs' claims and on the defendant's counter-claims. Counsel shall confer and submit an appropriate form of implementing order.