# In re LJM2 CO–INVESTMENT, L.P. Limited Partners Litigation.

## No. C.A. 300–N.

Superior Court of Delaware.
New Castle County.

Submitted: Nov. 4, 2004.
Decided: Dec. 21, 2004.

---

See also 794 A.2d 1276.

Alan J. Stone, Esquire, David J. Teklits, Esquire, Thomas W. Briggs, Jr., Esquire, Natalie J. Watson, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Thomas J. Hall, Esquire, Janice A. Payne, Esquire, Benjamin C. Rubinstein, Esquire, Chadbourne & Parke, LLP, New York, New York, Attorneys for Plaintiffs, LJM2 Liquidation Statutory Trust B and Edward N. Meyer.

Michael D. Goldman, Esquire, Peter J. Walsh, Jr., Esquire, Melony R. Anderson, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware; Joseph M. McLaughlin, Esquire, Michelle B. Cherande, Esquire, Simpson Thacher & Bartlett LLP, New York, New York, Attorneys for Defendants Gordon and Margaret Hargraves.

John L. Reed, Esquire, Matt Neiderman, Esquire, Duane Morris LLP, Wilmington, Delaware; Oscar Garza, Esquire, Michael R. Williams, Esquire, Gibson, Dunn & Crutcher LLP, Irvine, California, Attorneys for Defendant ML IBK Positions, Inc.

Frederick B. Rosner, Esquire, Jaspan Schlesinger Hoffman LLP, Wilmington, Delaware; Ira Lee Sorkin, Esquire, Donald A. Corbett, Esquire, Carter Ledyard & Milburn LLP, New York, New York, Attorneys for ML/LJM2 Co–Investment, L.P.

Martin S. Lessner, Esquire, Sara Beth A. Reyburn, Esquire, Young, Conaway, Stargatt & Taylor LLP, Wilmington, Delaware; Attorneys for Defendants DLJ Fund Investment Partners III, L.P., Merchant Capital, Inc., and Wachovia Investors, Inc.; Mel A. Brosterman, Esquire, Jeremy S. Rosof, Esquire, Strook & Stoock & Lavan LLP, New York, New York; Co-counsel for Defendants DLJ Fund Investment Partners III, L.P. and Merchant Capital, Inc., Paul E. Ridley, Esquire, Sheila Armstrong, Esquire, Kirkpatrick & Lockhart LLP, Dallas, Texas, Co-counsel for Wachovia Investors, Inc.

LAMB, Vice Chancellor:

## I.

A limited partnership was formed under Delaware law for the purpose of making investments in businesses related to Enron. Shortly thereafter, the general partner executed a credit agreement with a number of banks. After Enron declared bankruptcy, the bank creditors, acting pursuant to the credit agreement, forced the general partner to make a call upon the limited partners to contribute additional capital within the limit of their original capital commitment.

Before the call became due, the limited partners replaced the general partner and, with the concurrence of the new general

partner, amended the partnership agreement in an effort to rescind the capital call and prevent further capital calls. The limited partnership filed for bankruptcy, and the bankruptcy trustee later made another capital call on the limited partners. When the limited partners refused to honor that call, the trustee brought this action against the limited partners to recover monies allegedly owed to the limited partnership on account of the unsatisfied capital calls.

The limited partners have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. For the following reasons, their motion to dismiss is denied.

## II.

### A. *The Parties*

Plaintiff LJM2 Liquidation Statutory Trust B ("Trust B") is a Delaware statutory trust formed pursuant to the bankruptcy plan in the case *In re LJM2 Co–Investment, L.P.*, Case No. 02–38335 SAF. Plaintiff Edward N. Meyer is the managing trustee ("Trustee B") of Trust B. The sole beneficiaries of Trust B are the Bank Creditors.[1]

The defendants are the limited partners of LJM2 Co–Investment, L.P. (the "Limited Partners").[2]

### B. *Background Of LJM2*

In October 1999, Andrew Fastow, then employed as CFO of Enron, formed LJM2 Co–Investment, L.P. ("LJM2") under Delaware limited partnership law for the pur-

pose of making investments in energy and communications businesses related to Enron. Between December 1999 and April 2000, 52 individuals and businesses agreed to become the Limited Partners, committing over $394 million in capital to LJM2. Each Limited Partner executed a Subscription Agreement in which they agreed to be bound by the Third Amended and Restated Limited Partnership Agreement of LJM2 (the "Partnership Agreement") and to contribute capital to LJM2 as required by that Partnership Agreement.

On or about April 5, 2000, LJM2 Capital Management, L.P. ("Capital Management"), the general partner of LJM2, and the Limited Partners entered into the Partnership Agreement. As specified in Section 3.1(a) of the Partnership Agreement, each Limited Partner made an initial capital contribution of 15% of its overall Commitment.[3] The Commitment is defined in the Partnership Agreement as "the aggregate amount of cash agreed to be contributed as capital to the Partnership by such Limited Partner as specified in such Limited Partner's Subscription Agreement, except as otherwise provided in, and as the same may be modified from time to. time under the terms of, this Agreement." [4] Section 3.1(a) also obligated the Limited Partners to make additional capital contributions to LJM2 "at such times as the General Partner shall specify in written notices (each, a 'Drawdown Notice')," but limited their obligation to the amount of their Commitment.[5] Section 3.1(d) provided that each partner's fund-

---

1. The six Bank Creditors are Dresdner Bank AG, Credit Suisse First Boston, National Westminster Bank PLC (now known as Royal Bank of Scotland), Wachovia Bank National Association (formerly known as First Union National Bank), Merrill Lynch Capital Corporation, and Royal Bank of Canada.

2. By stipulation dated June 24, 2004, limited partner Dresdner Kleinwort Holdings, Inc. was dismissed from this action.

3. Partnership Agreement § 3.1(a).

4. *Id.* at 5.

5. *Id.* § 3.1(a).

ing obligation would expire upon the "termination of the Commitment Period" but, nevertheless, required contributions thereafter "to pay or provide for payment of Partnership Expenses, including Partnership funded indebtedness."[6] Finally, Section 3.1(f) proscribed any obligation by the Limited Partners directly to creditors, as follows:

> The provisions of this Agreement (including this Article III) are intended solely to benefit the Partners and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any creditor of the Partnership (and no such creditor shall be a third party beneficiary of this Agreement), and no Limited Partner shall have any duty or obligation to any creditor of the Partnership to make any Capital Contributions or to cause the General Partner to make a call for Capital Contributions.[7]

## C. The Credit Agreement

In the fall of 2000, Capital Management began soliciting the Bank Creditors to lend money to LJM2. During the solicitation, Capital Management provided the Bank Creditors with a Confidential Information Memorandum (the "CIM") which, in Section 4, stated that three sources would be available for LJM2 to repay the money: "(i) asset cash flows, (ii) asset liquidations, and (iii) draws on Partners' Capital Commitments."[8] Capital Management also attached a copy of the Partnership Agreement to the CIM.

In October 2000, the Limited Partners were advised that LJM2 was negotiating a loan with prospective lenders. They also were advised that the prospective lenders were told that "the Limited Partners' capital contributions would be available to repay [the loan], if necessary."[9]

In November 2000, the Bank Creditors agreed to loan LJM2 $120 million in an unsecured revolving Credit Agreement (the "Credit Agreement"). The Limited Partners did not participate in the negotiation of, and were not signatories to, the Credit Agreement. As a condition of entering into the Credit Agreement, the Bank Creditors required Capital Management to execute a General Partner Undertaking (the "Undertaking") to the effect that, if LJM2 defaulted on the Credit Agreement, the Bank Creditors would be bound to issue Drawdown Notices to the Limited Partners to the extent necessary to cure a payment default (up to the unfunded balance of the Limited Partners' Commitments).[10] Capital Management also agreed to a series of negative covenants, including a commitment not to amend the Partnership Agreement in a number of material respects without the written consent of a majority of the banks. As an obligation taken on by Capital Management in its capacity as General Partner, the Undertaking was also, presumably, binding on Partnership Services as successor General Partner.

## D. The Dispute

In 2001, after Enron went bankrupt and LJM2 defaulted on the Credit Agreement, the Bank Creditors invoked the provisions in the Undertaking to require LJM2's General Partner, Capital Management, to make a capital call on the Limited Partners (the "December 2001 Call"). The

---

6. *Id.* § 3.1(d).

7. *Id.* § 3.1(f).

8. Walsh Aff. Ex. D § 4.

9. Compl. ¶ 29.

10. Undertaking § 2 (Exhibit B to Credit Agreement).

amount of the December 2001 Call was $47 million, which, together with LJM2's available cash, would have provided "sufficient funding to pay off all accelerated amounts due to the Bank Creditors."[11] There is no dispute that this call was properly noticed and would not have been in excess of the Limited Partners' Commitments.

The Limited Partners did not satisfy the December 2001 Call.[12] Instead, before that call's due date, the Limited Partners took a number of steps for the purposes of avoiding any liability to respond and of preventing any additional Drawdown Notices from being issued by the General Partner. To accomplish these objectives, the Limited Partners executed written consents removing Capital Management as General Partner and appointing Partnership Services, LLC ("Partnership Services") as the replacement General Partner. This was accomplished by adding a new Section 6.10 to the Partnership Agreement. Among other things, that new section added a requirement of "the consent of the Majority Limited Partners to approve the issuance of any Drawdown Notices" by the General Partner.[13]

The Limited Partners amended the Partnership Agreement in several other significant ways (together with the amendments to Section 6.10, the "January 2002 Amendment"). These amendments purported to "compromise" the December 2001 Call to zero; rescind the December 2001 Call; and give a majority of the Limited Partners the ability to compromise any future calls. The relevant language added to Section 3.1(f) is as follows:

> The obligation of a Partner to make a Capital Contribution or return money or other property paid or distributed in violation of the Delaware Partnership Act may be compromised by the Majority Limited Partners. To the extent applicable and effective immediately upon the effectiveness of this Amendment, the undersigned hereby "compromise" the Capital Contributions referred to in the Drawdown Notice given on December 7, 2001 to the extent required by applicable law to rescind said Notice and agree that the Limited Partners of the Partnership are not required to make any Capital Contribution to the Partnership pursuant to said Drawdown Notice.[14]

Partnership Services signed the January 2002 Amendment, expressing its concurrence as General Partner. It also purported to exercise the General Partner's power of attorney to sign the January 2002 Amendment on behalf of all of the Limited Partners, including those whose actual consent was not obtained.[15]

In acting to amend the Partnership Agreement, the Limited Partners and Partnership Services claimed to act pursuant to Section 13.1 of the Partnership Agreement that generally permits a majority in interest of the Limited Partners, with the concurrence of the General Part-

11. Compl. ¶ 34.

12. Two of the Limited Partners contributed money due under the December 2001 Call, but LJM2 returned the money to them shortly thereafter. Compl. ¶ 40.

13. Section 6.10(b)(i) of the Partnership Agreement, as amended.

14. Section 3.1(f) of the Partnership Agreement, as amended.

15. The parties agree that the January 2002 Amendment was authorized by a less than unanimous vote of the Limited Partners. Compl. ¶ 38 ("[F]orty-five out of the fifty-two Limited Partners executed written consents...."). Several of the Limited Partners were affiliates of the Bank Creditors and, for obvious reasons, would not have consented to the compromise. Pls.' Answering Br. at 27 n. 17.

ner, to amend the Partnership Agreement. As will be discussed later in this opinion, that general power of amendment is subject to limitations, including, pertinently, a requirement for supermajority approval of any provision that requires supermajority consent to take action. That limitation is expressed, as follows:

> The Majority Limited Partners may, with the concurrence of the General Partner, vote to amend this Agreement in any respect; ... *provided, third,* that no amendments to this Agreement may change the percentage in Interest of the Limited Partners (the *"Required Interest"*) necessary for any consent required hereunder to the taking of an action unless such amendment is approved by a percentage in Interest of Limited Partners that is not less than the Required Interest at such time.... [16]

Without additional capital contributions from the Limited Partners, LJM2 was unable to satisfy its debts and declared bankruptcy in September 2002. After almost one year in bankruptcy, LJM2's Liquidating Plan of Reorganization (the "Plan") was confirmed. Approximately one month after the Plan's confirmation, Trustee B issued Drawdown Notices to the Limited Partners (the "September 2003 Call") pursuant to Section 3.1 of the Partnership Agreement for a total of $75 million.[17] The Limited Partners have not satisfied either the December 2001 Call or the September 2003 Call.

### E. *Prior Litigation*

On January 8, 2002, the Limited Partners filed the action styled *Alpine Inv. Partners v. LJM2 Capital Mgmt., L.P.,* 794 A.2d 1276 (Del.Ch.2002). In *Alpine,* the Limited Partners sought a declaration that their removal of Capital Management and appointment of Partnership Services was valid. The court ruled in favor of the Limited Partners based on the narrow procedural question of whether delivery is required for written consents of a limited partnership to become effective.[18] The *Alpine* court did not address itself to the validity of the January 2002 Amendment or the validity of actions taken by Partnership Services.[19]

### F. *Bankruptcy Proceedings*

Pursuant to the Plan, claims of the Bank Creditors were assigned to Trust B and Trustee B (the plaintiffs).[20] The Plan recognized the existence of these claims against LJM2 and confirmed the Delaware Court of Chancery as the appropriate ju-

---

**16.** Partnership Agreement § 13.1.

**17.** The Plan fixed the amount of Trust B's claim at $75,395,158.83. Compl. ¶ 47. Partnership Services is not named as a defendant for this claim because it received a complete release in LJM2's bankruptcy proceeding. Nevertheless, its actions remain relevant to the litigation. According to the allegations of the complaint, Partnership Services's participation and concurrence in the January 2002 Amendment was in breach of the Partnership Agreement, the Credit Agreement, the Undertaking, and its fiduciary obligations at a time when LJM2 was allegedly insolvent.

**18.** *Alpine,* 794 A.2d at 1278 ("Only one issue is presented: were the limited partners legally required to deliver their written consents to the General Partner for the removal vote to become effective, even though delivery is not required by the partnership statute or the Partnership Agreement?").

**19.** *Alpine,* 794 A.2d at 1278 n. 1 ("Accordingly, Capital Management's Third and Fourth Counterclaims [that Partnership Services's actions were invalid] will not be addressed at this time.").

**20.** A second action concerning LJM2, which is also being litigated in the Delaware Court of Chancery, relates to a separate set of claims. The Plan created Trust A to pursue those claims.

risdiction to pursue them against the Limited Partners. Standing in the shoes of LJM2 and its General Partner, Trust B and Trustee B filed this action on March 8, 2004 to force the Limited Partners to contribute that part of their remaining Commitment that will satisfy the debt of LJM2 to the Bank Creditors.

## G. *The Complaint*

The complaint alleges that the Limited Partners remain liable for their unpaid initial Commitments to LJM2 under both the statute and the Partnership Agreement. It also asserts a variety of tort claims against the Limited Partners arising out of the Limited Partners' efforts to avoid having to fulfill their Commitment to LJM2. Count I alleges that the defendants violated 6 *Del. C.* § 17–502 by refusing to honor their Commitments pursuant to the Partnership Agreement. Count II asserts a similar claim but casts it as a contractual matter, alleging that the defendants' failure to pay breached the Partnership Agreement and the Subscription Agreement. If the plaintiffs succeed on either of these two counts, all other counts appear to become moot.[21]

The other eleven counts are as follows:
· *Count III: Breach of the Credit Agreement.* The plaintiffs claim that the defendants adopted the Credit Agreement and became bound by its terms. Then, by not abiding by the capital calls, the plaintiffs argue, the defendants breached the Credit Agreement.
· *Counts IV and V: Tortious Interference.* The plaintiffs allege that the replacement of Capital Management with Partnership Services and the subsequent January 2002 Amendment combine to become tortious interference

with the Bank Creditors' Credit Agreement.
· *Count VI: Aiding and Abetting a Breach of Fiduciary Duty.* The plaintiffs contend that Partnership Services breached its fiduciary duty to LJM2 and the Bank Creditors by consenting to the January 2002 Amendment. The plaintiffs further allege that the defendants aided and abetted this breach.
· *Count VII: Avoidable Transfer.* The plaintiffs assert that the January 2002 Amendment and the ensuing compromise of the December 2001 Capital Call constitute avoidable transfers.
· *Count VIII: Breach of the Covenant of Good Faith and Fair Dealing.* The plaintiffs allege that the defendants breached the covenant of good faith and fair dealing by purporting to enact the January 2002 Amendment and then compromising the capital calls.
· *Count IX: Unjust Enrichment.* The plaintiffs contend that the defendants have been unjustly enriched due to their refusal to honor the capital calls.
· *Count X and XI: Breach of the Partnership Agreement re: Distributions.* The plaintiffs claim that various distributions made to the defendants during the course of LJM2's existence amount to a breach of the Partnership Agreement.
· *Count XII and XIII: Conspiracy to Engage in Fraudulent Transfer.* The plaintiffs assert that the defendants engaged in a conspiracy to avoid the capital calls, which effectively became fraudulent transfers.

The main issue before the court on the defendants' motion to dismiss is whether the well-pleaded allegations of the complaint support the claim that the Limited Partners are obligated to honor either the

---

21. For example, the plaintiffs' counsel admitted at the hearing that the tortious interference claim is irrelevant if the plaintiffs suc-

ceed on one of the first two claims. Trial Tr. at 89.

December 2001 Call or the September 2003 Call. The analysis of this issue requires a critical examination of the actions taken by Partnership Services and the Limited Partners in connection with the January 2002 Amendment. Because the court concludes that the complaint does state a claim for relief with respect to the two capital calls at issue, it will address the tort claims only as necessary.

## III.

When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint and all reasonable inferences to be drawn from those facts.[22] However, a court need not "blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."[23]

"To state a claim upon which relief may be granted, plaintiff need only provide a well-pleaded short and plain statement of the claim showing that the pleader is entitled to relief."[24] The court must then "determine whether it appears with reasonable certainty that, under any set of facts which could be proven to support the claim, plaintiffs would not be entitled to relief."[25]

## IV.

A. *Limited Liability Of The Limited Partners*

■ The basic premise of limited partnership law is that general partners are personally liable for partnership obligations but limited partners are not. "Under Delaware limited partnership law, a limited partner is not liable for the obligations of a limited partnership unless he or she is also a general partner or, in addition to the exercise of the rights and powers of a limited partner, he or she participates in the control of the business."[26] "However, if the limited partner does participate in the control of the business, he or she is liable only to persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner."[27]

■ The complaint does not allege that the Limited Partners held themselves out as general partners of LJM2. It follows then that they could not have caused a third party to transact business reasonably believing that they were general partners. The Credit Agreement was negotiated and executed by Capital Management on behalf of LJM2. The Bank Creditors knew that Capital Management was the general partner of LJM2. They further knew that they did not receive any personal guarantees from any of the Limited Partners. The Limited Partners argue, therefore, that the Bank Creditors cannot demand payment from them under the Credit Agreement.[28]

In response, the plaintiffs raise two important points. First, they argue that the

---

**22.** *Grobow v. Perot,* 539 A.2d 180, 187 n. 6 (Del.1988).

**23.** *Id.* at 187.

**24.** *Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 140 (Del.1997) (quoting, in part, Ch. Ct. R. 8(a)).

**25.** *In re Tri–Star Pictures, Inc. Litig.,* 634 A.2d 319, 326 (Del.1993).

**26.** *Beal Bank v. Lucks,* 2001 WL 220252, at *7 (Del.Ch. Feb.20, 2001) (quoting, in part, 6 *Del. C.* § 17–303(a)).

**27.** 6 *Del. C.* § 17–303(a).

**28.** The Limited Partners also maintain that Section 3.1(f) of the Partnership Agreement prevents the Bank Creditors from recovering monies under the Credit Agreement. Section 3.1(f) states, in relevant part, that "no Limited

Bank Creditors reasonably relied on the Partnership Agreement, in which the Limited Partners are obligated to contribute their Commitment to LJM2. To justify the Bank Creditors' reliance, the plaintiffs point to the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), which states in relevant part:

> Notwithstanding the compromise, a creditor of a limited partnership who extends credit, after the entering into of a partnership agreement or an amendment thereto which, in either case, reflects the obligation, and before the amendment thereof to reflect the compromise, may enforce the original obligation to the extent that, in extending credit, the creditor reasonably relied on the obligation of a partner to make a contribution or return.[29]

Second, they point to the Undertaking, which they maintain eliminated any conditionality to the future capital calls of the Limited Partners. While the Commitments may have originally been conditional (although the only condition would have been making the call itself), the Undertaking bound the general partner to make a capital call if LJM2 defaulted on the Credit Agreement, effectively making the Commitments unconditional. Thus, the plaintiffs argue, the Limited Partners are obligated to fulfill their original Commitments up to the amount necessary to satisfy the Credit Agreement.

It is important to note that the plaintiffs are not pursuing the defendants on a theory of general partner (or even quasi-general partner) liability. The plaintiffs are pursuing the defendants only for money that was committed to LJM2 in the original Partnership Agreement. The court, therefore, does not address the possibility that the actions of the Limited Partners somehow exposed them to the liability of the limited partnership or of the general partner. This litigation focuses on the Commitment that they initially agreed to contribute LJM2 in the Partnership Agreement. Whether or not the Limited Partners are obligated now to contribute capital to LJM2 to satisfy the Bank Creditors' capital calls, their liability here remains limited to the amount of the initial Commitments.

## B. Claims Asserted In The Complaint

First and foremost, this is an action by the Trustee to force the Limited Partners to honor their original Commitments to the extent necessary to repay all amounts due under the Credit Agreement. The dispute has arisen because, when they learned of Enron's bankruptcy and the December 2001 Call, the Limited Partners, acting in conjunction with Partnership Services, took a series of steps for the purpose of avoiding both the December 2001 Call and any future obligation with respect to their Commitments.

Fundamentally, the question presented by this litigation is whether the actions taken to avoid the Commitments succeeded in achieving that purpose, when viewed properly under Delaware's partnership law, LJM2's Partnership Agreement, the

Partner shall have any duty or obligation to any creditor." The Limited Partners' reliance on this section is misplaced. Section 3.1(f) protects the Limited Partners from a creditor pursuing them directly (i.e. when the creditor should be pursuing the limited partnership or the general partner). In this action, the plaintiffs are Trust B and Trustee B, who are standing in the shoes of LJM2 and its General Partner. They are attempting to recover money that was obligated to LJM2 by the initial Partnership Agreement. The fact that the plaintiffs, pursuant to the Plan, are recovering money that will be paid to the Bank Creditors is not relevant.

**29.** 6 *Del. C.* § 17–502(b)(1).

Credit Agreement, the Undertaking, and relevant legal and equitable principles. The defendants argue that their actions effectively "compromised" or rescinded the December 2001 Call and, as important, deprived Trustee B of the power to make the September 2003 Call without the consent of a majority in interest of the Limited Partners. They argue that these conclusions flow from a simple application of the statute to the Partnership Agreement, and they seek to prevent any inquiry into their dealings with Partnership Services or the actions taken by it.

The plaintiffs, of course, take the opposite view. Moreover, they allege a long list of other bases upon which to find the Limited Partners liable in the event that the Limited Partners actually succeed in avoiding payment of their Commitments. The argument seems to be that the actions taken by the Limited Partners and Partnership Services to avoid liability on the Commitments, if successful, were nevertheless inherently improper and result in liability under a variety of legal, equitable, or statutory theories.

The court's view is that the analysis of whether or not the Limited Partners remain liable on their Commitments, under either the statute or the Partnership Agreement in this action by Trustee B, will require the court to examine a number of questions beyond the language of the statute or the Partnership Agreement. Among these will be whether Partnership Services's participation in the adoption of the January 2002 Amendment breached its contractual or fiduciary duties and, if so, whether such a breach of duty should prevent the enforcement of the compromise or rescission of the December 2001 Call or the application of the newly added Section 6.10 of the Partnership Agreement to the September 2003 Call. It would seem that this last question, in particular, will re-quire a detailed understanding and exploration of the involvement of the Limited Partners in the actions taken by Partnership Services that, they claim, resulted in their immunization.

Because the court takes a broad view of the issues involved in determining the Limited Partners' liability on their Commitment, it takes a correspondingly narrow view of the alternative theories of liability alleged in the complaint. If, in the end, the court concludes that the Limited Partners can be held liable on their Commitments, there will be no reason for the court to undertake any separate factual or legal analysis of those various and numerous alternative bases for liability. By the same token, if, after that same analysis, the court concludes that the Limited Partners were privileged to act as they did and cannot be held liable under their Commitments, it is unlikely any of the alternative theories, each of which rests on some theory of misconduct, could prevail.

For these reasons, although the tort claims appear unsupportable regardless of the outcome on the first two counts, there is no judicial economy in dismissing them unless the other claims are also dismissed. Therefore, in this motion to dismiss, the court treats the complaint as a whole. The court will either allow all counts to proceed or dismiss the entire complaint.

## C. The Plaintiffs' Ability To Assert Claims

### 1. Standing

■ In Section 7.13 of the Plan, the Limited Partners agreed to the standing of Trustee B. As described in the Plan, "the Limited Partners consent[ed] to the standing and authorization under applicable law of Trustee B to prosecute the Capital Call Related Rights on behalf of the General Partner, the Debtor, and the Bank Group

Creditors...."[30] According to the Bankruptcy Code, "a confirmation order is a binding, final order, accorded full *res judicata* effect and precludes the raising of issues which could or should have been raised during the pendency of the case."[31]

Without addressing Section 7.13, the defendants argue that Trustee B cannot bring this action and attempt to support their argument by citing several cases in which a bankruptcy trustee was prevented from seeking recovery due to lack of standing.[32] Yet these cases are not instructive for two reasons. First, the defendants in the cited cases are third parties, while the Limited Partners are not, for these purposes, third parties.[33] Second, none of the cited cases involve a bankruptcy plan that, on its face, grants the trustee standing. Therefore, the court finds that the defendants are bound by the Plan and the plaintiffs have valid standing to assert claims regarding the capital calls.

**30.** Walsh Aff. Ex. B § 7.13 of Second Modification.

**31.** *In re Worldwide Direct, Inc.*, 280 B.R. 819, 821–22 (Bankr.D.Del.2002).

**32.** Defs.' Opening Br. at 34–37. *See, e.g., Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.)*, 336 F.3d 94, 100 (2d Cir.2003) ("Where a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors."); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1094 (2d Cir.1995) ("[W]hen a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors."); *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir.1991) (same).

**33.** The defendants make an argument that they, as Limited Partners, are separate legal entities, but this argument does not address the third party issue with regard to allowing a trustee to pursue a defendant. Here, the Limited Partners are part of the partnership and therefore not third parties in an action by someone standing in the shoes of the General Partner or the Partnership, seeking to enforce the Limited Partners' capital Commitments.

## 2. *In Pari Delicto*

The defendants next contend that the plaintiffs are barred from bringing this action by the doctrine of *in pari delicto*. "The doctrine of *in pari delicto* provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim."[34] In general, "under the *in pari delicto* doctrine, a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in."[35]

The doctrine of *in pari delicto* is simply inapplicable to the facts of this case. At the root of the complaint is a contract claim about whether the Limited Partners are obligated to fulfill their initial Commitment to LJM2. This claim does not concern some activity that is per se forbidden by law, like the Ponzi schemes[36] in the

**34.** *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir.2001).

**35.** *Id.*

**36.** A "Ponzi scheme" is "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments." *Black's Law Dictionary* 1180 (7th ed.1999).

In their reply brief, the defendants also rely on *In re Ozark Restaurant Equip. Co.*, 816 F.2d 1222 (8th Cir.1987). But *Ozark* does not concern the doctrine of *in pari delicto*. *Id.* at 1230 ("[T]here are no *in pari delicto* ... concerns in this case...."). The issue in *Ozark* concerned an alter ego action by the trustee in an attempt to recover for the creditor. The court in *Ozark* found that "[i]n summary, nowhere in ... [the] relevant provisions of the [Bankruptcy] Code is there any suggestion that the trustee has been given the authority to collect money not owed to the estate." *Id.*

cases cited by the defendants.[37] There is no comparison between a contract dispute and purposefully defrauding investors through a Ponzi scheme. Therefore, the court will not grant the motion to dismiss based on an *in pari delicto* argument.

### 3. The Defendants' Procedural Arguments

■ The court's decision to reject the defendants' standing and *in pari delicto* arguments will not prevent the defendants from raising in their answers any affirmative defense they may have to the claims seeking payment of their Commitments. Under bankruptcy law, "the trustee stands in the shoes of the debtors, and can only maintain those actions that the debtors could have brought prior to the bankruptcy proceedings."[38] As specified in the Plan, "Trustee B shall not have any rights greater than the rights of [the Debtor, the Bank Creditors, or the General Partner]...."[39] Additionally, the Limited Partners specifically reserved the right to "challenge the prosecution of Capital Call Related Rights of the Debtor and the General Partner for the benefit of any creditor...."[40]

The issues concerning whether Trustee B has valid claims against the Limited Partners or whether Trustee B's claims are barred by the participation of LJM2 (or either of its General Partners) in any alleged wrongdoing surrounding the affairs of LJM2 may present litigable matters. Without making any merits-based judgment, the court acknowledges the defendants' ability to raise defenses against the plaintiffs that would have been available against the debtor or general partner.

In this motion to dismiss, however, the defendants' arguments are not enough to overcome the plain language of the Plan. Clearly, the Plan grants Trustee B the necessary procedural rights to bring this action against the defendants. A plain reading of Section 7.13 of the Plan indicates that the Plan grants the defendants the right to challenge the prosecution of the litigation, not to have it dismissed before they answer the complaint. Therefore, the court declines to dismiss the present action based on the defendants' procedural arguments.

### D. Limited Partnership Freedom Of Contract

The court next considers whether (i) the December 2001 Call was validly compromised or rescinded; (ii) the September 2003 Call was valid or enforceable without the consent of the Majority Limited Partners; and (iii) limited partnership statutory provisions protect the interests of the Bank Creditors.

■ DRULPA "embodies the policy of freedom of contract and maximum flexibility."[41] As the Delaware Supreme

---

at 1229–30. In this action, the issue is whether the Limited Partners are liable to the partnership for their Commitments, not whether they are liable to the creditors. The plaintiffs are trying to collect money that is allegedly owed to the estate of LJM2. Therefore, *Ozark* is not relevant to whether *in pari delicto* is implicated when a trustee sues while standing in the shoes of the debtor partnership or general partner.

**37.** *See, e.g., R.F. Lafferty & Co.,* 267 F.3d 340; *Sender v. Buchanan (In re Hedged–Investments Assocs.),* 84 F.3d 1281 (10th Cir.1996).

**38.** *Hirsch,* 72 F.3d at 1093; *accord In re Gebco Inv. Corp.,* 641 F.2d 143, 146 (3d Cir. 1981).

**39.** Walsh Aff. Ex. B § 7.13 of Second Modification.

**40.** *Id.*

**41.** *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 817 A.2d 160, 170 (Del.2002) (citing *Elf Atochem N. Am., Inc. v. Jaffari,* 727 A.2d 286, 290, 291 n. 27 (Del.1999)).

Court has recognized, "by statute, the parties to a Delaware limited partnership have the power and discretion to form and operate a limited partnership in an environment of private ordering according to the provisions in the limited partnership agreement." [42] Only "if the partners have not expressly made provisions in their partnership agreement or [] the agreement is inconsistent with mandatory statutory provisions, ... will [a court] look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence." [43] The general policy of DRULPA "is that the liability of limited partners of a Delaware limited partnership is limited." [44] Nevertheless, "[t]o the extent a partnership agreement requires a partner to make a contribution, the partner is obligated, except to the extent such obligation is modified by the terms of the partnership agreement, to make such contribution to a limited partnership." [45]

### 1. The December 2001 Call And The January 2002 Amendment

The defendants argue that Section 13.1, which reads "[t]he Majority Limited Partners may, with the concurrence of the General Partner, vote to amend this Agreement in any respect," [46] gave them broad power to amend the Partnership Agreement. For further support, they rely on DRULPA's "policy of freedom of contract and maximum flexibility." [47] Based on this power, they say, they "compromised" the December 2001 Call to zero by an amendment to Section 3.1(f) of the Partnership Agreement. Even if this is not so, they contend, Partnership Services validly exercised its powers as General Partner to rescind the December 2001 Call.

The plaintiffs argue that the statute, by default, requires unanimous consent of Limited Partners for compromises of capital calls, and nothing in the Partnership Agreement prior to the January 2002 Amendment altered that default requirement. Moreover, they argue that the amendment to Section 3.1(f) purporting to reduce the requirement of unanimity to a simple majority was not validly adopted because it was not, itself, unanimously approved. Furthermore, they contend that, under the inalterable statutory default mechanism found in Section 17–502(b)(1) of DRULPA, the creditors are entitled to enforce the December 2001 Call, notwithstanding the later "compromise" of that

---

**42.** *Id.* (citing *Elf Atochem*, 727 A.2d at 287).

**43.** *Id.* (citing *Sonet v. Timber Co.*, 722 A.2d 319, 323 (Del.Ch.1998)). *See also Cantor Fitzgerald, L.P. v. Cantor*, 2000 WL 307370, at *21 (Del.Ch. Mar.13, 2000) ("*[O]nly* when the partnership agreement is silent or ambiguous, or where principles of equity are implicated, will a Court begin to look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence.") (citing *Sonet*, 722 A.2d at 324).

**44.** Martin I. Lubaroff & Paul M. Altman, *Delaware Limited Partnerships* § 5.4 at 5–11 (2004) [hereinafter "Lubaroff & Altman"]. *See, e.g., Sonet*, 722 A.2d at 322 ("Limited partnerships have become the limited liability entity of choice for certain closely-held business ventures and are especially prevalent in enterprises where a general partner (or a corporate subsidiary) is actively engaged in investing the limited partners' passive investments.").

**45.** Lubaroff & Altman § 6.3 at 6–3. *See also* 6 *Del. C.* § 17–502.

**46.** Partnership Agreement § 13.1. Alternatively, the defendants suggest that the General Partner would have the power to amend based on Article XII of the Partnership Agreement, which gives the General Partner power of attorney for the Limited Partners.

**47.** *Gotham Partners*, 817 A.2d at 170 (citing *Elf Atochem*, 727 A.2d at 290, 291 n. 27).

obligation. Finally, the plaintiffs argue that the December 2001 Call was not effectively rescinded.

The court will first address the validity of the amendment to Section 3.1(f). Under Delaware limited partnership law the statutory default for compromising an obligation of a limited partner is unanimous consent.[48] Section 17–502(b)(1) states in pertinent part:

> Unless otherwise provided in the partnership agreement, the obligation of a partner to make a contribution or return money or other property paid or distributed in violation of this chapter may be compromised only by consent of all the partners.[49]

It is conceded that, before the January 2002 Amendment, the Partnership Agreement did not "otherwise provide." Thus, the default provision of the law governed the Partnership Agreement, requiring unanimous approval to compromise an obligation to make a contribution.

The defendants contend that the January 2002 Amendment eliminated this default rule in favor of one that required only a majority in interest to compromise a contribution obligation. The question is whether that amendment was validly adopted. The power to amend partnership agreements is itself the subject of a default rule of unanimous consent. Under DRULPA, "[i]f a partnership agreement provides for the manner in which it may be amended, it may be amended in that manner or with the approval of all the partners or as otherwise permitted by law."[50]

The Partnership Agreement does contain a power of amendment that the defendants argue is broad enough to authorize the change in Section 3.1(f) permitting the compromise of contribution obligations by a majority in interest of the Limited Partners. In particular, they rely on the language of Section 13.1 that authorizes the amendment of the Partnership Agreement "in any respect" upon the agreement by the "Majority Limited Partners." This evidently broad power is, however, expressly made subject to certain restrictions, including the following:

> *provided, third,* that no amendments to this Agreement may change the percentage in Interest of the Limited Partners (the *"Required Interest"*) necessary for any consent required hereunder to the taking of an action unless such amendment is approved by a percentage in Interest of Limited Partners that is not less than the Required Interest at such time.[51]

Thus, the question presented is whether the default unanimity requirement found in Section 17–502(b)(1) was "required hereunder" within the meaning of Section 13.1 of the Partnership Agreement. Stated differently, does the two-word phrase "required hereunder" incorporate the default statutory provision into the limited partnership agreement such that unanimous consent continued to be required to compromise capital calls?

---

**48.** 6 *Del. C.* § 17–502(b)(1).

**49.** *Id.*

**50.** *In re Nantucket Island Assocs. Ltd. P'ship Unitholders Litig.,* 810 A.2d 351, 365 (Del.Ch. 2002). Section 17–302(f), as amended in 1998, states in pertinent part:

> If a partnership agreement provides for the manner in which it may be amended, it may be amended in that manner or with the approval of all the partners or as otherwise permitted by law. If a partnership agreement does not provide for the manner in which it may be amended, the partnership agreement may be amended with the approval of all the partners or as otherwise permitted by law.

**51.** Partnership Agreement § 13.1.

In the corporation law context, the answer would be clear. "[I]t is a basic concept that [Delaware] General Corporation Law [("DGCL")] is a part of the certificate of incorporation of every Delaware company."[52] As this court has recently stated, "[t]he substantive effect of [8 *Del. C.*] § 394 is to engraft the statutory rules provided in the DGCL onto every charter, to relieve drafters of charters of the burden of explicitly specifying every single one of those rules that they wish to adopt."[53]

Because DRULPA "embodies the policy of freedom of contract and maximum flexibility,"[54] the process of engrafting default statutory provisions onto an agreement of limited partnership should be undertaken with caution. Nevertheless, it is entirely consistent with that general policy to conclude that the unanimous consent requirement of Section 17–502(b)(1) was "required hereunder" within the meaning of the third proviso to Section 13.1 of the Partnership Agreement. The "contract" at issue—the Partnership Agreement—contained no provision relating to the compromise of contribution obligations. By choosing to include no such express provision, the parties to that agreement understood that the default rule of unanimity would govern their relations and the conduct of the partnership. Indeed, that rule became as much a part of their contract as any express provision of that agreement requiring supermajority approval for any action. Thus, it is appropriate to construe the

third proviso to Section 13.1 as including the uncontradicted statutory default of unanimity necessary for the compromise of capital calls. For these reasons, the court concludes that the amendment to Section 3.1(f) required unanimous approval.

There is no dispute that fewer than all of the Limited Partners executed consents to the January 2002 Amendment.[55] The defendants contend, however, that the January 2002 Amendment was unanimously approved because Partnership Services executed the amendment on behalf of all of the Limited Partners. This argument rests on the faulty premise that the power of attorney granted to the General Partner in the Partnership Agreement gave Partnership Services the power to consent on behalf of Limited Partners that had not agreed to the amendment.

Article XII does give the General Partner the power of attorney, but the defendants apply the power too broadly. The power of attorney granted to the General Partner was intended to give the General Partner the power to *execute*, not the power to *authorize*. As described in Section 12.2 of the Partnership Agreement:

> This power of attorney does not supersede any part of this Agreement, nor is it to be used to deprive any Limited Partner of its rights hereunder. It is intended only to facilitate the execution of documents and the carrying out of other procedural or ministerial functions.[56]

**52.** *STAAR Surgical Co. v. Waggoner,* 588 A.2d 1130, 1136 (Del.1991) (citing 8 *Del. C.* § 394).

**53.** *Jones Apparel Group v. Maxwell Shoe Co.,* 2004 WL 1192605, at *5 (Del.Ch. May 27, 2004).

**54.** *Gotham Partners,* 817 A.2d at 170 (citing *Elf Atochem,* 727 A.2d at 290, 291 n. 27).

**55.** The complaint alleges several of the Limited Partners were affiliated with members of the bank creditor group and that only 45 of the 52 Limited Partners executed consents approving the January 2002 Amendment. Indeed, the Limited Partners identified in footnote 17 of the plaintiffs' answering brief were affiliated with members of the bank creditor group.

**56.** Partnership Agreement § 12.2.

This granting of limited power for procedural or ministerial functions to a General Partner is not unusual,[57] and cannot be interpreted as giving the General Partner the power to override a decision by a Limited Partner. Therefore, the execution of the January 2002 Amendment by Partnership Services is not evidence of unanimous approval of that amendment.

Recalling their prior related litigation, the defendants also argue that the decision of the court in *Alpine* validated the actions contained in the January 2002 Amendment. *Alpine*, however, was decided on the narrow procedural issue of whether delivery is necessary for written consents to become effective in accordance with the statute and the voting provisions of the Partnership Agreement. The *Alpine* court apparently had no occasion to address the broader issues of invalidity implicated by the complaint in this action. Indeed, that court noted the narrowness of its decision and the agreement of the parties to defer other aspects of the litigation to a later date.[58] Therefore, *Alpine* provides no support for the defendants' argument regarding the validity of the January 2002 Amendment as it purported to amend Section 3.1(f) or the compromise of the December 2001 Call.

Finally, the defendants argue that, even if their efforts to "compromise" the December 2001 Call were unavailing, that call was, nonetheless, properly rescinded by Partnership Services. As a general matter, the court agrees that, as a simple question of power, the power to rescind a capital call, and thus to "abrogate, revoke or cancel" it,[59] is implicit in the General

Partner's power to make such a call in the first place. In addition, the power to rescind is not the same as the power to "compromise," which impliedly includes a power to discriminate among limited partners and, thus, the power of rescission is not necessarily subject to the unanimous consent requirement of Section 17–502(b)(1).

The conclusion that a power of rescission exists, however, is only the beginning of the analysis. The complaint fairly alleges that the action taken by Partnership Services to "rescind" the December 2001 Call was at once a breach of contract and a breach of fiduciary duty. Moreover, the complaint alleges grounds to infer that the Limited Partners appointed Partnership Services as General Partner with the full understanding that, once appointed, it would purport to exercise its powers to rescind the December 2001 Call for the purpose of giving the Limited Partners grounds to avoid complying with the call and with any future demands that they fulfill their Commitment to LJM2. In the circumstances, the complaint adequately states a claim that the rescission was not effective to prevent the enforcement of the December 2001 Call on behalf of LJM2 for the benefit of Trust B.

### 2. The September 2003 Call

The defendants further claim that the September 2003 Call was ineffectual since it was made without the consent of the "Majority Limited Partners," as required by the provision of Section 6.10(b)(i)(D) added to the Partnership Agreement by

---

57. *See, e.g., Regency Housing & Drilling Ltd. P'ship I v. Cohen,* 1991 WL 190311, at *3 (Del.Super.Ct. Sept.11, 1991) ("[T]he special power of attorney allows only a limited grant of authority to the general partners for the purpose of executing certain documents concerning the limited partnership.").

58. *Alpine,* 794 A.2d at 1278, n. 1.

59. Oxford Concise English Dictionary (9th Ed.1995).

the January 2002 Amendment. As they do with the December 2001 Call, the defendants rely on the *Alpine* decision to support the validity of the January 2002 Amendment. If the amendment itself is valid, they argue again, then actions taken pursuant to that amendment are also valid.

As already discussed, the *Alpine* decision did not conclude that Partnership Services's consent to the January 2002 Amendment was a valid exercise of power. Instead, that decision provided only that the Limited Partners who consented to that amendment had the power to vote at the time their consents were expressed. Also, as already discussed, the complaint adequately alleges facts that, if true, support an inference that Partnership Services's consent to the January 2002 Amendment resulted in both a breach of contract and a breach of fiduciary duty. In other words, the facts alleged in the complaint give rise to an inference that Partnership Services's consent to the January 2002 Amendment was part of a prearranged plan between it and the Limited Partners by which Partnership Services agreed that, if it were chosen to replace Capital Management, it would exercise the powers of General Partner to insulate the Limited Partners from having to fulfill their original Commitment to LJM2, thereby breaching the Undertaking and rendering the partnership insolvent. Thus, the complaint adequately alleges grounds on which this court of equity could enforce the September 2003 Call without regard to the Majority Limited Partner consent provisions found in the January 2002 Amendment.

3. *The Claim Under Section 17–502(b)(1)*

In the initial count of the complaint, the plaintiffs also argue that the interests of the Bank Creditors are protected by the language of Section 17–502(b)(1), which contains an express safeguard for creditors. The section states in relevant part that "a creditor of a limited partnership ... may enforce the original obligation [of a limited partner] to the extent that, in extending credit, the creditor reasonably relied on the obligation of a partner to make a contribution or return."[60] The plaintiffs point to Section 3.1 of the Partnership Agreement to support the inference of reasonable reliance on the part of the Bank Creditors. As alleged in the complaint, Section 3.1, as part of the Partnership Agreement, was attached to the CIM given to the Bank Creditors in the fall of 2000. The complaint further alleges that the Bank Creditors reasonably relied on Section 3.1 in extending credit to LJM2 because, under that section, the Limited Partners were obligated to contribute their Commitments when called for by the General Partner. The plaintiffs argue that the Bank Creditors removed this solitary condition to call the Commitments by creating interrelated agreements compelling the General Partner to make capital calls if LJM2 defaulted. The plaintiffs contend that, through the combination of the Credit Agreement and the Undertaking, the Bank Creditors created a situation in which they could rely on the Limited Partners' initial Commitments. Therefore, they continue, the complaint adequately alleges the reasonable reliance prong of Section 17–502(b)(1).

The defendants argue that, as a matter of law, the plaintiffs cannot demonstrate the reliance necessary to bring their claims under the protection of Section 17–502(b)(1) because the statute requires individual reliance. Since the complaint does

60. 6 *Del. C.* § 17–502(b)(1).

not allege individual reliance, the defendants argue, the statutory claim should be dismissed at this stage. Furthermore, the defendants claim that the plaintiffs should be estopped from arguing that the statute does not require individual reliance because of a "judicial admission" to the contrary by Partnership Services and LJM2.[61]

■ The defendants' estoppel argument is based on the fact that, in bringing this action, the plaintiffs stand in the shoes of Partnership Services and LJM2. Citing a brief from earlier litigation, the defendants argue that the plaintiffs have admitted that the reliance requirement under Section 17–502(b)(1) must be proven "on an individual basis."[62] The rule for judicial admissions, however, is that they "are limited to factual matters in issue and not to statements of legal theories or conceptions."[63] The statement that Section 17–502(b)(1) requires individual reliance is a legal concept, not a factual matter. Therefore, the statement attributed to the plaintiffs' predecessors in interest cannot be construed as a judicial admission.

■ Moreover, the court will not judicially estop the plaintiffs based on acts or statements of Partnership Services. "Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."[64] Those interests are not implicated here. As described above, it is reasonable to infer from the complaint that Partnership Services was acting in concert with the Limited Partners rather than advancing the interests of LJM2. Consequently, the brief cited by the defendants cannot be properly imputed to the plaintiffs. Despite the defendants' assertions, there is no danger here that the plaintiffs are deliberately changing their position. Additionally, the court finds no unfair advantage or unfair detriment demonstrated by the defendants. Therefore, the court will not judicially estop the plaintiffs with regard to the statutory reliance requirement under Section 17–502(b)(1).

■ In any event, the facts in the complaint, if true, adequately state reasonable reliance on the part of the Bank Creditors. Despite the defendants' argument that the complaint does not specify individual reliance, the court holds that the language of the complaint does indeed allow for an inference of individual reliance. The disputed sentence from the complaint reads as follows: "In extending credit to LJM2 under the Credit Agreement, the Bank Creditors reasonably relied on the obligations of the Limited Partners to make Capital Contributions including to cure any

61. Defs.' Reply Br. at 11.

62. *Id.* at 12.

63. *Levinson v. Delaware Comp. Rating Bureau, Inc.*, 616 A.2d 1182, 1186 (Del.1992) (citations omitted).

64. *In re Silver Leaf, L.L.C.*, 2004 WL 1517127, at *2 n. 9 (Del.Ch. June 29, 2004) the court described

several factors [that] typically inform the decision whether to apply the doctrine of judicial estoppel in a particular case [as]

whether the party's later position is "clearly inconsistent" with its earlier position, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled, and whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

Event of Default, if necessary." Based on the plain language of this sentence, the court reasonably infers that the phrase "the Bank Creditors" encompasses each Bank Creditor in its individual capacity. Nothing the defendants have submitted indicates otherwise.

**V.**

For the foregoing reasons, the motion to dismiss is denied. IT IS SO ORDERED.